NIXON *v.* STATE OF INDIANA.

[No. 26,236.    Filed January 8, 1935.]

*Gemmill, Browne & Campbell,* for appellant. ·

*James M. Ogden,* Attorney-General, *Merl M. Wall,* Assistant Attorney-General, *Byron C. Kennedy,* and *Milo N. Feightner,* for appellee.

HUGHES, J.—This is a case arising upon an information filed in the Wabash circuit court by the prosecuting attorney of said county, charging appellant with an indirect contempt of the Wabash circuit court.

The appellant was the editor and publisher of the Wabash Plain Dealer and Times Star, and he was charged with publishing in said paper certain alleged contemptuous articles of and concerning said court and the judge thereof, the Hon. Frank O. Switzer, relating to the appointment of a receiver for the Wabash County Loan and Trust Company in an action filed in said court by the state bank commissioner for the appointment of a receiver for said bank. Hon. W. H. Eichorn, as special judge, tried said cause. The appellant was found guilty, fined $100.00, and sentenced to jail for a period of ten days.

The appellant filed an answer in which he sought to purge himself of said alleged contempt of court. The error relied upon by appellant is that the trial court erred in overruling his motion for a new trial. Many reasons are assigned for a new trial, but for the purpose of this case we will only consider the first assignment to wit: That the finding of the court is not sustained by sufficient evidence and is contrary to law.

The answer of the appellant was in substance as follows: That the published articles, and each of them

were published in said newspaper upon what was regarded and believed by the defendant to be reliable information communicated to him from what he believed to be reliable sources of information, and that said articles and each of them were meant and intended to be published and circulated as criticisms of the past act, entry, and order of the Wabash circuit court and/or judge of the Wabash circuit court in appointing one Quentin Carver as receiver of the Wabash County Loan and Trust Company, in the cause pending in said court entitled *State ex rel. Symons v. Wabash County Loan and Trust Company*, for the appointment of a receiver therein. That said receiver was appointed on February 3, 1932, and the articles were not published until May 10, 1932, and subsequent thereto. That the defendant denies that, by the publication of said articles, he meant or intended to corrupt, embarrass, or influence said court or the judge thereof in the administration of the receivership in said cause, but only to criticize the appointment of said Carver as receiver of said company on the alleged ground that he was incompetent to serve in said capacity and this defendant still believes, and therefore avers the fact to be, that said Carver is incompetent to serve in the capacity of receiver of said company, and that his appointment was inadvisable when made.

That, insofar as said published articles purport to charge that the judge of said court was influenced by one Frank Plummer, an attorney at the bar of said court, to appoint said Carver as such receiver, and/or that said court or the judge thereof was persuaded or influenced by political or other considerations than the interests of said trust to appoint said Carver, as such receiver, this defendant alleges that said charges were based upon what he has since found to be incorrect and

mistaken information, and were not true, as published, although they were believed by the defendant to be true when they were severally published.

That said alleged charges, as hereinbefore averred, were not meant or intended to corrupt, influence, or embarrass the fair administration of justice and of the affairs of said cause in which said receiver was appointed, and that, when said respective articles were published, this defendant did not know of the filing or pendency in said court of any petition or other matters calling for judicial determination or action in said cause that might be affected in any way by the publication of said articles and he believes there was nothing contained in said published articles that had reference to any such matters or any petitions pending in said cause which required judicial determination and action. That he had no thought of prejudicing the public as to the merits of said cause or embarrass the administration of said receivership under the orders of the court or of corrupting said court or the judge thereof in reference to said matters, and only meant and intended to criticize the appointment of said receiver and the methods by which his appointment was procured, as he had been informed and believed. That at the dates of the several publications of said articles there was no petition or other matter pending in said cause which called for judicial determination or action in the matter of the appointment of said receiver or of any other receiver or officer of said court therein.

The information is very lengthy and we do not think it proper to set it out in full in this opinion as it would unnecessarily extend the opinion to too great a length. Many things were said in each of said publications that has no reference or application to the Wabash circuit Court or the judge thereof, and we will therefore only set out what we consider pertinent to the case.

The first publication was on May 10, and the headline thereof was as follows: "Keynote Speakers Hinder Rather Than Help Party to Win Votes Next Fall." Then it goes on to make an attack upon Mayor Homer Showalter and others, and then the following:

"Circuit Judge Switzer was another speaker for harmony and party success. The judge has recently insulted 3,500 depositors of the Wabash Loan and Trust by letting Frank Plummer select a man who could not collect, as auditor, a few hundred dollars public interest money and placing him in charge of collecting nearly a million dollars.

"To handle the defunct bank for the personal profit of City-School-Insull Attorney Plummer, who demands from the Republican party all the rich plums in receivership lines, and gets them, certain conditions had to be met. It was out of the question to pick a man capable of doing a good job himself in an impartial way and in the interest of depositors and stockholders. It had to be a man who first would represent the interest of greatest profits for politicians.

"To handle the misfortunes of the bank as political plunder, rather than on a business basis, the receiver must be a man who belonged to the Plummer faction. He must be so loyal there could be no danger of kicking over the traces. He must be wholly unfitted for the work. It was vitally essential he be so incompetent he could not act on any bank matters without orders from Plummer.

"Former Auditor Carver filled the bill perfectly. At the end of four years in the auditor's office he was getting so he could write a receipt. He knew little more about the general duties, which he never attempted to perform, when he went out of office than the day he went in. He was not cut out for that sort of thing. He was a good farmer and an honest man. He knew

nothing about books, business, or collecting money. He was the ideal trusting type needed for a place where it is of value to have a man who can have the wool pulled over his eyes.

"For unwittingly serving those with bad motives, a better man could not be picked. For serving depositors few worse could be chosen. Whatever he draws for his bank 'services' is that much of the bank's assets thrown away.

"Because of the insult Judge Switzer offered 3,500 depositors, to please City-School-Insull Lawyer Plummer, and to meet Plummer's demands to never be left out when the largest amount of taxpayer's money is to be had through politics, it would have been just as well for party success if Switzer had not been a talker endeavoring to inspire confidence in Republicanism as practiced by the gang in Wabash County."

On May 11 there was another publication under the heading of "More About Thick Hides." This was mainly an attack upon city attorney Plummer and made very little comment if any directly upon the court or the judge thereof. The following is contained in that publication:

"What would be a better name than 'Thick Hides' for the Showalter-Plummer-Wertenberger-Tomson coalition, which trains closely together to exert control of the civil city, school city, the county election boards, road material sales and contracts, receiverships viewed by Judge Switzer as political spoils rather than as matters of business, all Republican state and federal appointments, and to let nothing get out of its hands where there is an opportunity for one of the special privilege groups to be on the public payroll and swat the taxpayer?"

On May 12 an article was published under the heading of "Chamber of Commerce and Rotary Demanding

Plain Dealer Silence." Among other things the article said:

"The President of Rotary is Frank Plummer, who prevailed on Circuit Court Judge Switzer to name Q. A. Carver receiver of the Wabash County Loan and Trust Company.

"Rotary and the Chamber of Commerce demand silence of the Plain Dealer.

"If these organizations were on the side of the 3,500 depositors whose money is tied up in this bank, wouldn't the joint memberships be unanimously resolving to demand of the judge that Carver be removed?

"What reason was there for selecting a man whose chief qualification is that by training and environment a more unfair man for the place could not have been selected? He can't even figure interest on a note. Yet he is in charge of collecting nearly a million dollars. What is the nigger in the woodpile?

"Why a puppet? What is there to cover up? What illegitimate profits to be made at the expense of the suffering depositors through wrongfully handling by an honest receiver who would not know wrongdoing if he saw it. What would have happened if 3,500 depositors had not formed a militant organization to be on constant watch for justice and economy?

"If the court had named a receiver worthy of confidence would it have been necessary for a volunteer depositors' committee to work without pay to insure a square deal?

"For the first time in its history the gang met organized resistence to its secret schemes when a depositors' committee which stood firm against being won over to gangland got into action and forced economy of receivership management much to the disappointment of those who had different plans."

The article of May 13, under the heading of "Service

Before Self" contained the following, among other things:

"Rotarian Frank Plummer desiring a huge slice of personal profits from obsequies of the Wabash County Loan and Trust prevailed on Rotary Brother Judge Switzer to select a man for technical receiver who Rotarian Switzer would not think of selecting if the money were his own.

"Rotarian Switzer suggested it would be better to have a trained banker well qualified to handle such an important matter, but Rotary Brother Plummer objected to a competent receiver. His profits would be much less if this were done. Rotarian Plummer overcame Rotarian Switzer's desire to act for the best interest of the community and the court carried out the scheme of naming a man Plummer could handle.

"Thereby Rotarian Switzer delighted Rotary Brother Plummer and disappointed 3,500 bank depositors."

The article of May 16, under heading of "No Apologies to Make," contained, among other things, the following:

"Republican Circuit Court Judge Switzer has changed his mind. He has ordered Prosecutor Kennedy to prepare papers citing the Plain Dealer publisher for contempt of court. Apparently Switzer has yielded to pressure of a well known Republican gang of professional politicians. Prosecutor Kennedy comes up for reelection this fall.

"If it is a jailable offense to criticize the court for naming a man receiver generally known to be unfit to administer affairs of a million dollar bankrupt bank, and that the cause of his selection was to be a 'dummy' to be handled by someone else, the publisher is willing to go to jail. The case is not one to be tried by a jury. It is to be tried by three judges who are called in and act without a jury.

"If a time has come when bank receiverships can be handled as political plunder by selection of men wholly unfit to protect interest of depositors, and that criticism of such acts means jail, or a fine, or whatever a committee of three judges may decide is to be the penalty for not letting a judge get away with an outrageous act without criticism, the people should know how much they are at the mercy of professional politicians who happen to have a judge on their side.

"Selection of an honest dirt farmer, and later a Roann garage keeper with no training to qualify him for complexities of settling affairs of a million dollar bank is indefensible. It was rotten.

"Judges may decide to say an act of their brotherhood is rotten is a reflection on the dignity of the court. If they do let them make the most of it. What dignity has a court which will go against the welfare of thousands of injured depositors to make profits for friendly politicians?

"The Plain Dealer heretofore has not used the term 'rotten.' It does now. The newspaper has no apologies for its published opinions.

"The publisher may be imprisoned. But that will not change the fact it is a blot on the community; a handicap to its business life and stain on Judge Switzer's bench not to appoint a competent banker, or a highly trained business man to administer affairs of a mlilion dollar bank without needless delays and expenses of incompetency, which add hardships for 3,500 depositors —most of them poor people—who had entrusted their funds to that bank."

It was upon the foregoing publications that the information was based.

Did the court err in refusing to discharge the appellant and in overruling the appellant's motion for a new trial?

We think it must be conceded that if the articles upon which the information is based, are criticisms of the court or judge after the matter with which the ■ criticism has to do has been finally adjudicated and the proceedings are ended so that the carrying out of the court's judgment can not be obstructed, the publications are not contempt and can not be summarily punished by the court however false, malicious, or unjust they may be unless it affirmatively appears that the publication of the articles would obstruct, impede, or interfere with, or embarrass the court in the administration of justice in the future stages of the case.

It must be borne in mind that the first publication was on May 10, 1932, and the appointment of the receiver was in February, 1932.

From a careful reading of the publications we find that they refer to the appointment of the receiver in February, 1932, a past transaction, and to the character and qualifications of the receiver and the influence which brought about the appointment.

In the case of *Craig* v. *Hecht* (1923), 263 U. S. 255, 278, Chief Justice Taft said:

"It is of primary importance that the right freely to comment on and criticize the action, opinions and judgment of courts and judges should be preserved inviolate; but it is also essential that courts and judges should not be impeded in the conduct of judicial business by publications having the direct tendency and effect of obstructing the enforcement of their orders and judgments, or of impairing the justice and impartiality of verdicts.

"If the publication criticizes the judge or court after the matter with which the criticism has to do has been finally adjudicated and the proceedings are ended so that the. carrying out of the court's judgment can not be thereby obstructed, the publication is not contempt and can not be summarily punished by the court however false, malicious or unjust it may be. The remedy of the judge as an

individual is by action or prosecution for libel. If, however, the publication is intended and calculated to obstruct and embarrass the court in a pending proceeding in the matter of the rendition of an impartial verdict, or in the carrying out of its orders and judgment, the court may, and it is its duty to protect the administration of justice by punishment of the offender for contempt."

And this court in the case of *Cheadle v. State* (1887), 110 Ind. 301, 310, 11 N. E. 426, 59 Am. Rep. 199, said:

"The general rule is, that to constitute any publication a contempt, it must have reference to matters then pending in court, and be of a character tending to the injury of pending proceedings upon it, and of the subsequent proceedings. . . . It follows, therefore, that comments, however stringent, which have relation to proceedings which are past and ended, are not in contempt of the authority of the court to which reference is made. Such comments may constitute a libel upon the judge, or some other officer of the court, but can not be treated as in contempt of its authority."

See also following cases: *Zuver* v. *State* (1919), 188 Ind. 60, 121 N. E. 828; *State* v. *Kaiser* (1890), 20 Ore. 50, 23 Pac. 964, 8 L. R. A. 584; *Ex Parte Green* (1904), 46 Tex. Cr. 576, 66 L. R. A. 727; *State ex rel. Att'y. Gen.* v. *Circuit Court* (1897), 97 Wis. 1, 72 N. W. 193, 38 L. R. A. 554.

In the case of *Zuver* v. *State, supra,* this court said, p. 62:

"As a part of this paragraph of answer and as a reason why he should not be punished for contempt, appellant asserts under his oath that the proceeding referred to in said published article was not pending before the court at the time such publication was made, but that it had been fully and finally decided and determined before that time. If this statement is true, the publication of the article would not constitute a contempt of the court, even though it may have been inaccurate or false and may have been prompted by improper or malicious motives. Under such circumstances the publi-

cation of the article might constitute an unjustifiable criticism of the conduct of the court, but it would not amount to contempt, because not made with reference to proceedings pending in the court at the time. When a defendant undertakes to purge himself by a verified answer filed in a proceeding for indirect contempt of a criminal nature, the facts stated therein must, in such proceeding, be treated as a verity. If the facts so stated under oath are sufficient to show that no contempt was committed, the defendant must be discharged. The rule thus stated is very ancient and it is still followed. Mr. Blackstone says: 'If a party can clear himself upon oath, he is discharged; but, if perjured, he may be prosecuted for perjury.' "

The court held that the court erred in not discharging the appellant upon the facts stated in his own sworn answer. See *Burke* v. *State* (1874), 47 Ind. 528.

The last paragraph of the sworn answer of the appellant states:

"That, at the dates of the several publications of said articles, there was no petition or other matter pending in said cause which called for judicial determination or action in the matter of the appointment of said receiver or of any other receiver or officer of said court therein, and that the only matter, act, entry and order criticized and meant or intended by this defendant to be criticized by the publication of said articles had occurred, had taken place and had been made long before any of said articles were published."

Section 3-909, Burns 1933, §886, Baldwin's 1934, among other things, states:

. . . "but if the defendant shall answer to the facts set forth in such rule, by showing that, even if they were all true, they do not constitute a contempt of the court, or by denying or explaining or confessing and avoiding them, so as to show no contempt was intended, then, and in every such case, the court shall acquit and discharge the defendant."

When the information, the answer of the defendant, and the law as heretofore set out, including the part of section 3-909, *supra*, as quoted, are all considered, the question is, should the appellant have been discharged? We think this question should be answered in the affirmative, but, in doing this, we do not want to be understood as approving the articles and language used that appeared in the different publications made by the appellant. It appears from the information that in the appointment of the receiver, Judge Switzer, did nothing that was not fair and proper. Three attorneys appeared in court representing depositors and stockholders who had interests in the bank to the extent of more than one hundred and eighty thousand dollars and that they had no objections to the appointment of Quinten Carver as receiver, that the judge stated in open court that he thought someone with banking experience should be appointed. That a large audience was present in the court room composed of many depositors, stockholders and several directors of the bank and the judge asked, in a loud voice, "if there were any objections to the appointment of Carver, or if there were any other names to suggest for the appointment." That he repeated the questions several times and there being no objections or other names suggested he appointed Carver as receiver. It is admitted by the appellant, in one of his publications, that Carver was an honest man. He had been auditor of his county and evidently a man of some influence in his county and community. It was appellant's opinion that Carver was not qualified but others and the court thought he was. Their judgment was probably as good or better than that of the appellant and there was certainly no ground or reason for the bitter attack he made upon the appointment.

We think that it must be conceded that all of the publications, as far as pertaining to court or the judge

thereof, referred to the appointment of the receiver, a past transaction, and under the law this would not subject the appellant to a contempt of court. And we do not think it can be said that the published articles impeded, embarrassed, or obstructed the administration of justice. It is true that during the administration of the receivership, there may be many petitions filed requiring adjudication upon questions of preferences, set-offs, and claims of different character. And in fact the information stated that such claims were pending at the time of the publications but none were specifically set forth. But even so, none of the publications referred to them, but only to the facts surrounding the appointment of the receiver. The receivership may be in court for several years before the business of the bank is wound up and it certainly could not be contended that a newspaper would be forestalled, for this reason, to criticize the action of the court or judge in appointing a receiver.

Let us imagine, if we can, some court or judge appointing a man as receiver for a bank who was known to be an outlaw, dishonest, and in every respect lacking the qualifications of an upright and honest citizen. Would anyone be bold enough to contend that because during the course of the receivership, petitions would be filed and in fact were filed, to adjudicate set-off claims and preferences, a newspaper would be denied the right to attack and criticize the appointment until after the receivership was closed or else be in contempt of court or judge making the appointment? We can not conceive of such a situation.

In the case of *Craig* v. *Hecht, supra,* Justice Holmes filed a dissenting opinion and we think some of the language he there used is in point here. He said, p. 281:

"It is not enough that somebody may hereafter move to have something done. There was nothing then awaiting decision when the petitioner's letter was published. . . . But if there had been, and giving the most unfavorable interpretation to all that the letter says, I do not see how to misstate past matters of fact of the sort charged here could be said to obstruct the administration of justice. . . . A man can not be summarily laid by the heels because his words may make public feeling more unfavorable in case the judge should be asked to act at some later date, any more than he can for exciting public feeling against the judge for what he already has done."

The right to freely comment and criticize the action, opinion, and judgments of courts is of primary importance to the public generally. It is not only good for the public but has a salutary effect upon the courts and judges as well. Courts and judges are not and should not be above criticism and as long as they are not impeded in the conduct of judicial business by publications having the direct tendency and effect of obstructing the enforcement of their orders and judgment, or of impairing the justice and impartiality of verdicts there is no right to enforce a contempt proceeding.

If it be conceded, and we think it must be, that the publications merely refer to the past act of appointing a receiver, then we can not see how, or in what manner, the articles published could be said to impede, interfere with, or embarrass the administration of justice in the steps taken in the future. We do not think it is the policy of the law to unduly extend the doctrine of contempt proceedings as applied to publications claimed to impede, interfere with, or embarrass the administration of justice. It must clearly appear that such publications do impede, interfere with, and embarrass the administration of justice before the author of the publications should be held for contempt. In the instant case, we do not believe the publications

impeded, interfered with, or embarrassed the administration of justice and as they were criticisms of a past act the author can not be held guilty of a contempt of court.

As said in the case of *State of Oregon* v. *Kaiser, supra,* p. 57:

> "The inherent power of a court of justice to punish for contempt one who commits acts which have a direct tendency to obstruct or embarrass its proceedings in matters pending before it, or to influence decisions regarding such matters, is undoubted; but it can hardly be maintained, from the adjudications had upon the subject in the various states, that such power is broad enough to vest in the court the authority to so punish any one for criticizing the court on account of its procedure in matters which have fully terminated, however much its dignity and standing may be affected thereby, however unjust, rude or boorish may be the criticism, . . ."

The appellant in his answer states that the only matter, act, entry, and order criticized and meant or intended by the appellant to be criticized by the publication of said articles had occurred, had taken place, and had been made long before any of said articles were published.

He also states in his answer that he denies that, by the publication of said articles, he meant or intended to corrupt, embarrass, or influence said court or the judge thereof in the administration of the receivership in said cause, but only to criticize the appointment of said Carver as receiver of said company on the alleged ground that he was incompetent to serve in said capacity and that he still believes, and avers the fact to be, that said Carver is incompetent to serve in the capacity of receiver of said company and that his appointment was inadvisable when made.

We believe that the answer of appellant is reconciled with the articles published of and concerning the court

and judge; we further believe that he has shown by his answer that no contempt was intended and, therefore, under the law and under Section 3-909, Burns 1933, §886, Baldwin's 1934, he should have been discharged.

Judgment reversed.